THOMAS O'HEAR *v.* LOUIS DEGOESBRIAND, JOHN TWOMBLY AND JOHN MINARD.

*Pews. Contract. Evidence. Canon Law. Trust. Trespass.*
*Tenants in Common.*

The owner of a pew in a church has an exclusive right to its possession and enjoyment for the purposes of public worship, and may maintain trespass *quare clausum fregit* for a violation of such right of possession, even against the society or person in whom the title to the land and building is vested.

O'Hear *v.* DeGoesbriand et al.

A church was erected by means of money raised upon a subscription, expressed in terms to be "for the purpose of building a catholic chapel." *Held*, that parol evidence was admissible to show that the purpose of the subscription was to build a Roman catholic chapel, to be used as a place of worship according to the rites and ceremonies of the Roman Catholic Church.

Notwithstanding the canon law of the Roman Catholic Church forbids the owning or controlling of a pew in a church by a layman, *held*, that whether or not, this law was recognized or adopted by the signers of such a subscription paper, was a question of fact and not of law; and that therefore parol testimony was admissible to show that it was originally agreed among the subscribers, that they should have the choice of pews, to be held as their own property, in the order of the amounts of their respective subscriptions; and that the pews were divided and held by them in severalty.

After the subscribers had made a contract for the purchase of land for their church site, by which contract the owner of the land agreed to convey it when the price was paid, (no person or society to whom the conveyance was to be made being named in the contract,) they erected the church and divided the pews, allotting one to the plaintiff, after which time for five years he occupied it in severalty, and was recognized by the other subscribers as the owner thereof. After the pews were divided and the subscribers had paid a portion of the price of the land to the owner, he conveyed it to the Roman Catholic Bishop of. the diocese, the balance of the price being paid by a third person. *Held*, that the bishop by this conveyance acquired the legal title to the land only as trustee for the subscribers, and that for a destruction of the plaintiff's pew by him, or his agents, the plaintiff could maintain trespass.

Where one tenant in common occupies a particular part of the common property by the agreement of the other tenants in common, it is so far a severance in fact as to permit him to maintain trespass against them for the same acts which would constitute trespass in a stranger, even though the length of such occupation would be insufficient to mature an absolute legal title in severalty.

TRESPASS QU. CL. FR., with a count in case, for the destruction by the defendants of a pew in the Roman Catholic Church in Highgate.

Plea, the general issue, and trial by jury, at the April Term, 1859,—ALDIS, J., presiding.

The plaintiff's testimony tended to show the following facts : in November and December, 1848, and in January and February, 1849, the Roman Catholics of Highgate held a meeting to take measures for building a church : they appointed a clerk, a treasurer, and a committee to buy land and obtain subscriptions : two sub-

O'Hear *v.* DeGoesbriand et al.

scription papers were drawn up and signed, one to buy the land, and the other to build the church. The first was in the following words : " This is to show what is paid towards the purchase of the two lots of land for the use of chapel." The other was expressed to be " for the purpose of building a Catholic chapel in Highgate village." The plaintiff signed both the subscription papers as did also the defendants Twombly and Minard, and circulated them among the people.   An agreement was made by Messrs. S. W. & S. S. Keyes with some of the signers, that when the Catholic society of Highgate would pay two installments of eighty-seven dollars each, the first installment payable in one year, the second in two years from January, 1849, then they were to deed the land described, to the Catholic society of Highgate.   The plaintiff's testimony also tended to show, that the Rev. Mr. Hamilton was then the Catholic priest of Highgate, and that he twice in public meeting told the people to subscribe liberally, and that he would sign as much or nearly as much, and that they should have their reward or position in the church in proportion to what they subscribed, and that they should get their allotment or pews according to the amount they paid, and that when the subscription paper was circulated for signatures, the signers were told by the committee, that according to their subscriptions should be their reward or choice of seats in the church.   The plaintiff subscribed and paid towards the church and land fifty-seven dollars and thirty-five cents.

In 1851 there was a meeting of the building committee, to accept the church as finished.   At this time there were no pews or seats in the church.   Some wished to have the plaintiff and Christie find materials and put in pews, and be paid for such materials and work in putting in the pews, three dollars for each pew ; others favored temporary seats.   At this time the Rev. Mr. McGowan was the Roman Catholic priest of Highgate, and by his directions and by agreement with him the plaintiff and Christie furnished the materials and put in the pews, and were to be paid therefor at the rate of three dollars per pew, by those who took pews.   After the pews were put in, about two or three years after the church was begun to be built, the Rev. Mr. McGowan gave public notice at a meeting of the Catholics for religious service in Highgate, that in one month from that time

he should come to Highgate to allot the pews. He told the plaintiff, who was the treasurer and collector, to get all the sums that each one had paid at different times, and add them together, and make a list of them ; and said that each one should have his pews according to the list, (those who had paid the largest amounts being entitled to the first choice,) and that each one taking a pew was to pay Christie and the plaintiff three dollars as aforesaid. The plaintiff made out the list. At the appointed time, in September, 1851, McGowan came, and distributed the pews at a meeting of the subscribers according to the list; he marked a pew of the plaintiff's No 1. Some objected, and said they would not take pews. He told them they must come forward and choose their pews, or the next in rotation should take ; that it was not a thing for a day or a month but forever, while a stick or a stone of the church remained ; he told them the pews would be their property forever, while one stick or stone of that church remained on another, that if they did not get pews *then*, they could not *afterwards*. The pews, or a large portion of them, were thus divided among the subscribers ; and the plaintiff thus got his pew, (being the one for the removal of which this suit is brought.) The persons to whom the pews were thus set, always thereafter occupied them respectively as their pews ; and the plaintiff had always occupied the pew thus set to him as his pew, from that time forward. The right of the respective pew holders to their pews was not questioned while the Rev. Mr. McGowan was priest. In 1855, after Mr. McGowan had left, and when the Rev. Mr. Lionnet was the priest of Highgate, the plaintiff first heard the right to his pew questioned. Lionnet claimed that a layman could not hold property in a church, and requested the plaintiff and others to give up their pews, that they might be rented, and the rents applied to the support of the priest and to the payment of the debts of the church. The plaintiff refused to do so. On the 13th of of May, 1856, after various interviews between the plaintiff and others on the one part, and the defendant DeGoesbriand, the Roman Catholic Bishop of the Diocese of Vermont, on the other, the defendant DeGoesbriand acting as the Bishop of this See, at a public meeting in the church, requested the plaintiff, among others, to give up his pew. The plaintiff was then in the occu-

pancy of his pew.  He declined to comply with the request of the bishop, and soon left the house ; and soon after, within one or two hours, the bishop, and the other two defendants by his directions, tore up the plaintiff's pew and removed it from the house.

The plaintiff's testimony also tended to show that at the first meeting held by the Catholics in Highgate, in 1848, for the purpose of buying land and building a church, it was agreed that the one who signed the most should have the first choice in pews, and so along down ; that at another meeting shortly after, it was told what they could get the land for, and that they could have a bond for a deed, and they concluded to take it and go on and build the church ; that there was no Catholic society in Highgate organized in pursuance of the statutes of this State, but there were certain individuals, both French and Irish, in Highgate, who were in the habit of attending the services of the Catholic church, and who called themselves the Catholic society of Highgate, and who united and contributed to buy the land and build the church; that when the subscription papers were circulated, the subscribers were informed that they would have their rights or pews in the church in proportion to what they signed ; that the plaintiff and others supposed that the land would be deeded to the Catholic society of Highgate ; that they could so take the title ; that the plaintiff never heard that the land was to be deeded to the bishop ; that the plaintiff and others had no knowledge that the land was deeded by the Messrs. Keyes to Bishop Fitzpatrick, of Boston, at the time it was so deeded, or for some time thereafter.

The testimony of the plaintiff further tended to show, that the plaintiff collected and paid the Messrs. Keyes towards the land bought of them, about sixty-two dollars.

The defendants offered in evidence the following written contract, dated Oct. 11, 1850: " We, S. W. & S. S. Keyes do hereby promise and agree that we will execute a good warrantee deed of (describing the land on which the Catholic church in Highgate was built,) being the land on which is now built a Roman Catholic church, provided that the Rev. Edward McGowan does well and truly pay to us the sum of one hundred

and fifty-seven dollars and twenty-four cents on the first day of May, 1851, with interest," also deeds from S. S. and S. W. Keyes respectively, to John B. Fitzpatrick, who was then Roman Catholic Bishop of the Diocese of Boston, dated January 25th, 1853 ; and also two promissory notes, dated January 25th, 1853, for eighty-six dollars and sixty-two cents each, payable to S. S. Keyes, or order, and signed by E. McGowan, Adam Christie and John Hanna.

The testimony on the part of the defendants tended to show that these notes were given for the balance of the price of the land, and were paid by the Rev. Mr. McGowan, one of the makers ; that by McGowan's directions the deeds were drawn to Bishop Fitzpatrick ; that the contract of Oct. 11th, 1850, was drawn up by Keyes as a memorandum of the contract, and remained in Keyes' possession, and was never in the possession of either the plaintiff or McGowan ; that when the plaintiff paid Keyes the sixty-two dollars, Keyes gave him a receipt therefor, and at the same time made this memorandum on his cash book : " Rec'd, Feb 20th, 1849, of Thos. O'Hear, treasurer of Catholic Society, as per our Rec't, this sum of sixty-two dollars," and that Keyes, in the receipt he gave, agreed to deed this land to the Catholic society when the payments were made ; that O'Hear professed to be acting as treasurer of the society.

The testimony of the defendants further tended to show that in 1848 the Rev. Mr. Hamilton was a Roman Catholic priest, and as such had charge of the parish of Highgate, and proposed to the catholics of that vicinity to raise funds by subscription to build a church in Highgate ; that a subscription paper was got up to build a church, and another to buy the land for it ; that they held meetings, appointed a clerk, a collector, and a building committee ; that it was thought the people could not pay so soon as the first subscription paper specified, and so another subscription paper was drawn up and signed, the subscribers and the amounts being the same in both, but the time of payment different ; that at first there was no talk about putting in pews ; that after Hamilton left they began to talk of putting in pews ; that the Rev. Mr. Shane succeeded Mr. Hamilton in the care of the parish for a short time, and while he was there, there was talk of put-

O'Hear *v.* DeGoesbriand et al.

ting in pews; that then the Rev. Mr. McGowan took charge of the parish; that by his directions Christie and the plaintiff put in the pews, and were to be paid three dollars for each pew, by those who took pews; that when he distributed the pews, and at the meeting when he gave notice therefor, he informed the congregation that those who took the pews should have the right to hold them while he was the priest of the parish, but that he could not make laws to bind his successors; that when another priest came he could not make laws for him. Some of the witnesses for the defendants testified that McGowan said at the time of sale that those who paid three dollars could hold the pews while he staid as priest, and while they staid in Highgate, but if they left they must leave the pew to the church; that if they came back after leaving, they could have their pews again free of rent; that this should be so while he was priest there, but whatever priest came after must make his own arrangements. The witnesses for the defendants testified that they did not hear it said that those who took pews were to hold them forever. Some of the witnesses for the defendants also testified that they heard of no agreement as to owning pews when the meetings were held for building the church. The testimony of the defendants also tended to show that in the fall of 1854 the Rev. Mr. McGowan was succeeded by the Rev. Mr. Lionnet; that he claimed that the persons who thus held pews should give them up, and that they should be rented for the support of the priest and to pay the debts of the church, and that the laymen could not, by the laws of the catholic church, own pews in a church; that the pew holders at first refused to give them up; that the defendant, DeGoesbriand, then the Roman Catholic Bishop of Burlington, sustained and confirmed the position taken by Mr. Lionnet; that finally all the pew holders assented to the requisitions of Mr. Lionnet, and gave up their pews, except four, of whom the plaintiff was one. The defendants also introduced the testimony of Bishop DeGoesbriand, (the Roman Catholic Bishop of the See of Vermont,) showing that by the settled and well known law of the Roman Catholic Church, no layman can hold or control any pew or other property in a catholic church without the consent of the bishop, and that

the plaintiff, being a layman, could not own a pew in the church without the consent of the bishop.

It also appeared that this church in Highgate had always been used by the Roman Catholics for public worship, and been under the control and supervision of Roman Catholic priests to this time.

It also appeared that the defendant, DeGoesbriand, is the bishop of the See of Burlington, which includes Vermont; was consecrated October 30th, 1853, and installed November 6th, 1853, and that Bishop Fitzpatrick put into his sole and exclusive care, charge and possession, all the lands and church buildings, and church property, in the State of Vermont, which had been deeded to Fitzpatrick, for him (the bishop of Burlington) to control, possess, and manage as he saw fit, and that the two men (the other defendants) who removed the pew of the plaintiff acted by his (the bishop's) direction, and that he, in what he did, acted with the full authority and assent of Bishop Fitzpatrick.

The defendants insisted that as the legal title to the land was in Bishop Fitzpatrick, even if the plaintiff had a beneficial interest in the land, or in the pew, he could not sue the defendants in this form of action, for acts done by them when acting under the authority of Bishop Fitzpatrick ; that as there was no " Catholic Society in Highgate," as named in the contract, the contract was void, and that in such case there would be no resulting trust, that the land should be deeded to those who furnished the money ; that even if those who furnished the money would stand in the place of the " Catholic Society," still there could be no severance of their interests, so that any one of them could own a pew in severalty, unless *all* the subscribers agreed to the severance ; that even if all did *agree* to a severance, still there could be no severance so as to vest a pew in severalty in any one person, unless there was a severance in writing, or adverse possession by the person so holding in severalty, for fifteen years ; that the occupancy of the pews by the plaintiff and others claiming to own them in their own right in fee, would not create such an adverse possession of the land as to defeat the deeds to Bishop Fitzpatrick ; and the defendants so requested the court to charge the jury.

O'Hear *v.* DeGoesbriand et al.

The court charged the jury as follows :

"To enable the plaintiff to recover, he must show, first, that at the time of the alleged trespass, he had the right to the exclusive use and occupancy of the pew ; and secondly, that the defendants have disturbed him in the enjoyment of the use and occupancy of the pew, and have forcibly taken it away. The great controversy between the parties is upon the first point, as to the plaintiff's right to the pew. As to the second point, it is substantially admitted by the defendants that the defendant, Bishop DeGoesbriand, did claim,— acting under the authority of Bishop Fitzpatrick,— to require the plaintiff to give up his claim of right to the exclusive occupancy of the pew, and that, the plaintiff refusing, he tore up and carried out the pew of the plaintiff, so that there was no pew to occupy. The burden of proof is on the plaintiff, and it is for him to show that he had the right to the exclusive use and occupancy of the pew. Before proceeding to consider the law and the facts of the case, the court will make a few preliminary remarks. The rights of the plaintiff and defendants must depend wholly upon the agreement between the various parties connected with the purchase and deeding of the land, and with the building of the church, upon their acts pursuant to or in violation of such agreements, and upon the laws of this State as applied to them. The law of the Catholic Church has no force in determining what the rights of these parties are, except as the parties have made the law of that church a part of their agreement. If the plaintiff and the other subscribers agreed to buy land and build a church, and to have it deeded to the bishop of Boston, they had a right to make such an agreement, and are as much bound by it as by any other agreement. If they agreed that the property should belong to the bishop, and that no layman should own a pew except by his consent, such agreement was valid and binding on them. If they did not so agree, but agreed to have it deeded to their society, or to themselves, and that they should own both land, church and pews, then such agreement would be binding. The law enforces the agreement of the parties, and it is the duty of the jury, from the evidence and under the charge of the court, to ascertain what the agreement was. The record title to the land and church is in Bishop Fitzpatrick,

and he has thus a legal title superior to the plaintiff's title ; and the bishop of Burlington, claiming to act by the authority of the bishop of Boston, denied the plaintiff's right to the exclusive use and occupancy of the pew, and, to prevent his exercising such alleged right, has taken away the pew.

The title thus appearing of record, the plaintiff claims to have acquired his right and title to the pew, and a right to the exclusive use and occupancy of it, sufficient to sustain this action, from the following facts, which he claims the testimony on his part establishes, viz : that the subscribers, of whom the plaintiff was one, agreed among themselves to buy the land of Keyes (then the owner of it) and have it deeded to the society ; that they did in fact pay for the land, take possession of it, and build the church ; that they put pews into the church and divided them into severalty ; and that the plaintiff, by his subscriptions and contributions to the land and church, bought one of them and had it severed to himself, and that all this was done pursuant to the original agreement among the subscribers ; that Keyes agreed to deed the land to the society, and knew that the subscribers had agreed to buy it, and had taken possession of it, and were building a church ; that the plaintiff, from October, 1851, to May 13th, 1856, occupied the pew so severed to him, claiming to own it in his own right ; and that Keyes, after the subscribers had taken possession of the land, and had built the church, and made the pews and divided them into severalty, conveyed the land without the consent of the subscribers, to the bishop of Boston, he taking the deed, but paying no consideration therefor toward either the land or church.

The defendants claim, in regard to the facts so claimed by the plaintiff, first, that the original agreement was that the land should be deeded to the bishop of Boston, and not to the Catholic society of Highgate ; secondly, that there was no original agreement among the subscribers that the pews should be divided among themselves, and be owned by each in severalty, but that the agreement was that the church should be built and held pursuant to the laws of the Catholic church, and that no layman should hold a pew in it without the consent of the bishop ; thirdly, that in fact there was no severance by the agreement or

acquiescence of all the subscribers; and fourthly, that there was no severance of the pews so that each should own his pew while the church lasted, but only during the term of Mr. McGowan's ministry in that parish."

The court further charged the jury that it was immaterial, as affecting the plaintiff's right to recover in this suit, whether the original agreement among the subscribers was that the land should be deeded to the bishop of Boston or to the Catholic society of Highgate, provided it was the original agreement among the subscribers that they should buy the land and pay for it, and build a Catholic church on it, and should have the pews in the church divided among and allotted to the subscribers in severalty, so that they might hold them in severalty, as their own property, and provided they did so build the church, buy the land and divide the pews into severalty, pursuant to such agreement, and have possession and hold such pews in severalty, and provided that the plaintiff so had his pew severed, and held the same in severalty, and by actual possession at the time of the alleged trespass; that in short the title to the land and edifice might well be agreed to be conveyed to the bishop, and yet the pews be reserved to the pew holders, and if they did so agree, and did practically act upon such agreement, as above stated, that would be sufficient to enable the plaintiff to recover, notwithstanding the legal title to the land and church was in the bishop.

The court further charged the jury that it was not necessary that the original agreement in regard to the manner in which the pews should be held, should be in writing, nor that there should have been the consent of the bishop of Boston to the division and severance of the pews among the subscribers, provided there was such an original verbal agreement as above stated, and provided that there was an actual and practical division of the pews among the subscribers, in pursuance of the agreement as claimed by the plaintiff, and possession of them from the time of the alleged severance, and provided the plaintiff so held and possessed his pew in severalty up to the time of the alleged trespass.

But the court charged the jury that the plaintiff could not recover if the agreement among the subscribers was that the land was to be conveyed to the bishop of Boston, and that no

layman should hold a pew without the consent of the bishop, but that the land and church and pews should be under the control of the bishop, pursuant to the law of the Catholic church, as claimed by the defendants.

The court also told the jury that the plaintiff could not recover unless the jury found that the original agreement among the subscribers was that the pews should be divided among the subscribers, so that each might own his own pew in severalty, and that such agreement had been practically carried out and acted upon as before stated, and not as was claimed by the defendants, viz: that they were to hold their pews only during McGowan's term as their parish priest.

As to the point made by the defendants, that the severance and division of the pews among the subscribers must be by agreement of *all* of the subscribers, the court charged the jury, first, that the severance and division of the pews among the subscribers must have been agreed to at the time by all of the subscribers ; or, secondly, if the severance and division of the pews among the subscribers were according to the original agreement, and had been acquiesced in *by all*, so that thereafter by common consent of the subscribers, the plaintiff was recognized and agreed by all of the subscribers to have the right to the exclusive occupancy and ownership of this pew, and the plaintiff did so occupy up to the time of the trespass, claiming such right, that would be a sufficient severance and division of the pew to the plaintiff to enable him to bring this suit. And the court charged, contrary to the request of the defendants, that it was not necessary, in order to enable the plaintiff to sustain this action, that the plaintiff should have either a deed or other instrument in writing conveying to him a right to this pew, or that he should have had the continued and adverse possession of the pew for fifteen years, but told the jury that if they found that the original agreement among the subscribers was that they should buy the land, build the church, and divide and have and own among themselves in severalty, the pews as before stated, and if they found that such agreement was acted on, and practically carried out, and that by the agreement or acquiescence of all the subscribers, as before stated, this pew was severed to the plaintiff, and held and claimed by him as his

own exclusively from the time of such division to the time of the alleged trespass, these facts (if found) would enable the plaintiff to sustain this action against the defendants, although they acted by the authority of the bishop of Boston.

The jury returned a verdict for the plaintiff.

To the charge as given, and to the refusal to charge as requested, and to the admission of the parol evidence offered by the plaintiff, to show the original verbal agreement in regard to the holding and division of the pews among the subscribers, as claimed by the plaintiff, the defendants excepted.

*B. H. Smalley*, for the defendants.

*Wm. W. White, H. S. Royce* and *L. E. Pelton*, for the plaintiff.

KELLOGG, J. This is an action of trespass *q. c.*, with a count in case joined under the statute, (Acts of 1856, No. 8,) for the destruction by the defendants of a pew in the Roman Catholic chapel or church in Highgate, which the plaintiff claims to have owned as his property.

It appeared from testimony introduced on the trial which was not controverted, that the building of this church was commenced in the year 1849, and finished in 1851, and that when the building was commenced, the land upon which it was erected was owned by Messrs. S. W. & S. S. Keyes; that from September, 1851, to the time of the alleged trespass by the defendants in tearing up and removing the pew in question, which was on the 13th day of May, 1856, the plaintiff was in the exclusive use and occupancy of that pew whenever the church was open for public worship; that on the 25th of January, 1853, the title and estate of the Messrs. Keyes in the land on which the church was erected was conveyed to the Right Rev. John B. Fitzpatrick, who at that time was the bishop of the Roman Catholic diocese of Boston, of which the State of Vermont formed a part; that in October, 1853, the territory within the limits of the State of Vermont was separated from the Diocese of Boston, and erected into a new Diocese of the same church, called the Diocese of

Burlington, of which the defendant, DeGoesbriand, was duly appointed and installed as the bishop, and that upon his installation he was authorized by Bishop Fitzpatrick to take charge of the church buildings in Highgate, and to control and manage the same as he thought proper. It is not questioned that Bishop DeGoesbriand succeeded to, and is invested with all the rights connected with this chapel or church which belonged to Bishop Fitzpatrick, and it is admitted that the other two defendants who assisted in tearing up and removing the pew in question, acted under his directions.

Pews constitute a subject of peculiar ownership. They are defined to be inclosed seats in churches, and it is said that according to modern use and idea, they were not known till long after the reformation, and that enclosed pews were not in general use before the middle of the seventeenth century, being for a long time confined to the family of the patron ; (Hook's Church Dictionary, title *Pews*.) In England the right of property in a pew is a mere easement or incorporeal right, and hence the English doctrine that case only will lie for the disturbance of the occupant. In *Boothly* v. *Baily*, Hob. 69, (13, sec. 1,) it is held that the church and church yard are, in law, the soil and freehold of the parson, yet the use of the body of the church, and the repair and maintenance of it is common to all the parishioners : " And for avoiding of confusion, the distribution and disposing of seats and charges of repair belong to the ordinary," (or person having ecclesiastical jurisdiction,) " and therefore no man can challenge a peculiar seat without a special reason," as prescribing to repair and maintain it. But in this country the owner of pew has an exclusive right to its possession and enjoyment for the purposes of public worship, not as an easement, but by virtue of an individual right of property, derived in theory at least from the proprietors of the edifice or freehold, and hence trespass *quare clausum* lies for a violation of the owner's right of possession. It is now well settled in this country that in the absence of any statute provisions, this kind of property is to be considered as real estate in all cases arising under the statute of frauds, or of conveyances, or of descents and distributions ; 1 Greenleaf's Cruise on Real Property, 44 ; *Shaw* v. *Beveridge*, 3 Hill 26 ; *Jackson* v.

*Rounseville*, 5 Metc. 127; *Kellogg* v. *Dickinson*, 18 Vt. 266 ; *Hodges* v. *Green*, 28 Vt. 358 ; *Barnard* v. *Whipple*, 29 Vt. 402 ; *First Baptist Church in Ithica* v. *Bigelow*, 16 Wend. 28 ; *Vielie* v. *Osgood*, 8 Barb. Supr. Ct. 130. "Pews or slips in meeting houses, or places of public worship," are declared to be real estate in this State by statute ; (Acts of 1853, No. 33.) In the case of *Kellogg* v. *Dickinson, ubi supra*, it is said by WILLIAMS, Ch. J., that "in this country a church may be built by a parish, an incorporated society, or by an individual. These several methods were recognized in the case of the *Bakersfield Congregational Society* v. *Baker*, 15 Vt. 119. The persons who build a meeting house in either of these ways may retain the fee and maintain an action of trespass for an injury to the yard or buildings, and the right to a seat or to the pews may be in other individuals entirely distinct from them. The interest of the pew holders is several. They have an exclusive right to occupy a particular seat, to the exclusion of all others, when the house is used for the purpose for which it was erected."

The persons who by their agreement, efforts and means, create property of this description, have an unquestionable right to establish its character and incidents, provided that these be such as are not inconsistent with the laws of the State, and the respective rights of the plaintiff and the defendant, DeGoesbriand, will, therefore, depend upon the agreement entered into between the various parties connected with the purchase and conveyance of the land upon which the church was erected, and with the building of the church itself.

The original subscription for the building of this chapel or church was, by its terms, a subscription "for the purpose of building a Catholic chapel in Highgate village," and the subscription for the purchase of the land for the site is expressed to be "towards the purchase of the two lots of land for the use of chapel." The term "*Outholic Chapel*" used in the first of these subscriptions has no such precise and definite signification as to exclude extrinsic oral evidence to interpret its meaning, or to point its application to the subject matter. The courtesies of private society and of political and religious controversy accustom us to concede to persons of any communion or party such appel-

lations, by way of distinction, as they choose to assume for themselves, but we should disregard a most palpable reality if we failed to recognize the fact that large bodies of Christians, not in communion with the church of Rome, assert in their creeds and daily worship their right to the name of Catholic, and reject as heretical and schismatical any assumption that the terms Catholic and Roman Catholic are equivalent or even allied in signification. The sense in which this term was used and understood by the subscribers when they made their subscriptions " for the purpose of building a *Catholic* Chapel " is, therefore, properly to be determined by extrinsic oral evidence, and it appears that such evidence was introduced on the trial, without objection, to show that the building of this chapel was an undertaking commenced, carried on, and accomplished by the Roman Catholics in that vicinity, and that after its completion it was always used by that denomination of Christians for public worship, and had always been under the control and supervision of priests of that communion.    These facts were not controverted on the trial, and are, therefore, to be regarded as proved.   This subscription must, therefore, be considered and treated as if it had been expressed to have been made "for the purpose of building a Roman Catholic Chapel," to be used as a place of public worship, according to the rites and ceremonies of the Roman Catholic church.   It appeared on the trial that the owning or controlling of a pew in a church by a layman is forbidden by the canons or ecclesiastical laws of that church, and that the plaintiff was a layman.    But the canon law of the Roman Catholic church, considered in reference to any intrinsic obligation, has no force or authority in this State.    It is a law of the church, and not of the State, and it is not to be considered in determining the legal rights of the parties except so far as it was recognized in or made a part of the agreement or contract under which those rights are derived.    In the elaborate and lucid opinion delivered by WILLIAMS, Ch. J., in *Smith* v. *Nelson*, 18 Vt. 511, (see p. 549 to 552,) he says that in this State " we have no religious establishment, no ecclesiastical law, or courts, established by any authority.    All their laws are wanting in this essential requisite to give them any authority, that they are not ' *prescribed by the supreme power in a State.*'    And though they

O'Hoar *v.* DeGoesbriand et al.

may form constitutions, enact canons, laws or ordinances, establish courts, or make any decisions, decrees or judgments, yet they can have only a voluntary obedience, [and] cannot affect any civil rights, immunities or contracts, or alter or dissolve any relations or obligations arising from contracts."

It is urged on the part of the defendants that the object and design of the parties to the original undertaking to build this chapel or church, as expressed in their subscriptions, was to erect a Roman Catholic church, and that the admission of the right of a layman to own and hold a pew therein would prevent its being a Roman Catholic church, even though recognized in the subscription or agreement, and that any agreement for the division of the pews among the subscribers to be owned in severalty, whether contained in the original subscription or agreement, or not, is to be rejected and disregarded as being repugnant to the obvious design and intent of the parties in reference to their proposed undertaking ; that the original subscription for the building of the church was a contract in writing that the church to be built by the funds to be raised should be a Roman Catholic church, and that no parol testimony should have been admitted to show that at the time the subscription papers were signed there was a parol agreement made by the parties thereto that the several subscribers (they being laymen,) should own the pews in the church, because it would be repugnant to the written contract, inasmuch as the building to be erected could not be a Roman Catholic church if laymen were permitted to own pews in it. Assuming the purpose expressed in the subscription papers to be that of " building a Roman Catholic chapel," the natural import of those terms in their popular sense would seem to be that the building to be erected should be used as a house for the celebration of public worship according to the rites and ceremonies of the Roman Catholic church, and such a use of the building is consistent as well with the claims of the plaintiff as with those of the defendants in this case ; for the celebration of public worship cannot be said to be necessarily, if at all connected with any right of property in the pews. The agreement or intention of the original subscribers to the undertaking is to be carried into effect whenever properly ascertained, but we regard the question

39

whether the rules of the canon law, in relation to the property in the pews, were adopted or recognized by them when they entered into the original agreement or contract for the building. of this chapel, as being one of fact and not of law, and unless those rules were so adopted and recognized by the subscribers, we ought not to interpolate them into the text of the original con- tract. We do not, therefore, consider that the parol testimony offered by the plaintiff, which was received to show the original verbal agreement in regard to the division and holding of the pews among the subscribers, as claimed by the plaintiff, tended to establish a purpose or arrangement which was inconsistent or at variance with the written agreement, and we think that it was properly left to the jury to ascertain and determine from the evidence, under the charge of the court, what the agreement of the subscribers in respect to rights of property in the pews was, and whether it was contemplated or understood by them, in making the agreement, that those rights were to be subject to and regulated by the canons of the Roman Catholic church, or were to be controlled by their own mutual agreement or contract. The jury, under the charge of the court, found that the original agreement among the subscribers was that they should buy the land and build the church, and that the pews should be divided among the subscribers, so that each might own his pew in severalty, and that this agreement was practically carried out and acted upon; that there was a severance and division of the pews, agreed to at the time it was made, by all of the subscribers, or made according to the original agree- ment and subsequently acquiesced in by all the subscribers, so that thereafter, by common consent of the subscribers, the plain- tiff, who was one of their number, was recognized and agreed by all of them to have the right to the exclusive occupancy and ownership of the pew in question, and that the plaintiff, from that time forward up to the time of the trespass complained of, did so occupy that pew claiming that right. And the court charged the jury that the plaintiff could not recover if the agree- ment among the subscribers was that the land, church and pews, should be under the control of the bishop, and held pursuant to the laws of the Roman Catholic church, and that no layman

should hold a pew in the church without the consent of the bishop. The jury, by their verdict for the plaintiff, have negatived the existence of any agreement or understanding of that character among or on the part of the subscribers.

The cases of *Kellogg* v. *Dickinson*, 18 Vt. 266, *Jackson* v. *Rounseville*, 5 Metc. 127, and *Shaw* v. *Beveridge*, 3 Hill 26, fully adopt the principle that the right of property in pews, when owned by private individuals, is separate and distinct from the title to the fee or freehold of the church itself, and that trespass *quare clausum* lies at the suit of the owner for a violation of his right of possession of the pew, and especially for its actual destruction. In view of the facts thus found by the jury, it would be immaterial, as affecting the plaintiff's right of recovery, whether the original agreement among the subscribers was that the land should be conveyed to the Bishop of the Diocese, or to the persons who styled themselves the "Catholic Society of Highgate." There is nothing in the case tending to show that the Messrs. Keyes ever treated the original contract made with them, for the purchase of the land on which the church was erected, as being forfeited by reason of a non-compliance with its terms; but, on the contrary, they appear to have recognized it as a valid and subsisting contract, which they were willing to execute on their part whenever the price of the land was paid to them. When their title was conveyed to Bishop Fitzpatrick in January, 1853, they had received the full price of the land according to the terms of the original contract, and a part of the payment for the land had been made to them by the plaintiff on behalf of the subscribers for that object; and the plaintiff then held the pew in question in actual possession in severalty, under a division of the pews in fact, previously made by the agreement or acquiescence of all who were then interested in the property. After the land was paid for, the Messrs. Keyes should be regarded as holding the legal estate or freehold of the land and the church for the benefit of the persons who purchased the land and erected the church; and, for a forcible injury to the possession of any pew then owned in severalty, the pew owner could have sustained trespass even as against them; and it is quite obvious that Bishop Fitzpatrick, who paid

nothing towards the price of the land or the expenses of building the church, or as a consideration for the conveyance to him, could stand, as their grantee, in no right or position in regard to those who were then the owners of the pews in the church, superior to that in which the Messrs. Keyes themselves stood at the time of making their conveyance to him.

It is urged on the part of the defendants that the right to pews is real estate, and can only be divided among tenants in common by a conveyance in writing, or by fifteen years possession under a parol partition ; that five years possession alone, will not make a legal severance of the tenancy in common ; that if the plaintiff had any right to the pew in question, it was the right of a tenant in common with two of the defendants, (Twombly and Minard,) who contributed to the fund to buy the land and build the church ; and that an action of trespass *vi et armis* or *quare clausum* will not lie in favor of one tenant in common against his co-tenant. Where the grantees of a township made a division of it in fact among themselves, and the division was acquiesced in for a period of fifteen years, it has been recognized as a valid division in law, however informal it might have been, and although not made in conformity with the requisitions of the statute. *Booth* v. *Adams et al.*, 11 Vt. 156. Such a division ripens by a possession under it for fifteen years into an absolute legal title in severalty. It is true that one tenant in common cannot bring an action of trespass against another for entry upon, and enjoyment of, the common property ; but when one tenant in common occupies a particular part of the common property by the agreement of the other tenants in common, it is regarded as being so far a severance in fact as to permit him to maintain trespass against them for the same acts which would constitute trespass in a stranger, even though the length of such occupation would be insufficient to mature an absolute legal title in severalty. This principle was settled in the case of *Keay* v. *Goodwin*, 16 Mass. 1, and is recognized in the case of *Booth* v. *Adams et al.*, *ubi supra ;* and in 4 Kent's Comm. 370, it is said that if one tenant in common " occupies a particular part of the premises by agreement, and his co-tenant disturb him in his occupation, he becomes a trespasser." See also the case of *Johnson et al.* v. *Goodwin*, 27 Vt. 288.

These principles dispose of all the points made on the argument of this case. The case of *Smith* v. *Bonhoof*, 2 Mich. 115, was cited in the argument on the part of the defendants as an authority for the proposition that a church could not be a Roman Catholic church in which a layman was permitted to own a pew, inasmuch as it would be in violation of one of the fundamental laws of the church. ·The facts on which the controversy in that case arose were in substance as follows : One Beaubien conveyed a piece of ground to Lefevre, Bishop of the Roman Catholic Diocese of Detroit, and his successors in office, in trust, for the erection of a church thereon to be used as a place of public worship, and for the spiritual use, benefit, and behoof of the German Roman Catholic church congregation in the city of Detroit, according to the rites and ceremonies of the Roman Catholic church, and for other trusts therein expressed. The deed also provided that in the event of a vacancy in the office of Bishop, happening between the death of Bishop Lefevre and the appointment of his successor, the premises should vest during such vacancy in the Archbishop of the Roman Catholic church of which the Diocese should be a suffragan. Trustees of the church were afterwards elected by the congregation organized as a corporation under the statute law of the State The priest officiating in the church under the Bishop leased a pew in it to the defendant, Bonhoof, who went into the possession of it, and the trustees rented the same pew to Smith, the plaintiff. The question in the suit was whether the officiating priest, or the trustees, had the right to control and rent the pews ; and the claim of each party was referred exclusively to the right to the control of the church edifice, and not to any private right of property in the pews distinct from and independent of that right, like that claimed by the plaintiff in this case. It was held that, under the deed of trust, and the constitution, laws, and usages of the Roman Catholic church, by which the administration of the temporalities of the church is vested in the parish priest, the right to rent the pews belonged to the priest, and not to the trustees. In the opinion of the court delivered by Ch. J. WHIPPLE, in that case, he says : " If I am to believe the testimony of witnesses, it is clear that when *the control of the church edifice* is wrested from the clergy and placed in the hands of lay-

men, it ceases from that moment to be a Roman Catholic church." But he does not intimate that a church in which a layman was allowed to own a pew could not be considered as a Roman Catholic church, and the case did not involve the decision of any such question. In view of the fact, stated in the very able and elaborate argument for the defendants in this case, that, by the provisions of the canon law, leases of pews in a church, whether in writing or by parol, cannot exceed three years in duration, that case furnishes a suggestive commentary upon a proposition of that character, as well as upon the alleged universality of the application of the rules of the canon law in respect to property in pews, in the fact, which appears in the report of the case, that in the fourth condition of the deed of trust from Beaubien to Bishop Lefevre, it was provided that, as soon as the church to be erected on the land should be completed, Beaubien, the grantor, and his wife might select and choose a pew in the church, and have and hold the same during each of their natural lives, free and clear of all expense, payment, assessments, and charge whatsoever. Our conclusions in this case result from the application of the principle that the original agreement of the subscribers or donors who, by the union of their efforts and contributions, created the property in this church and its pews, is to be carried into effect when properly ascertained; and this principle is fully recognized in the case of *Smith* v. *Bonhoof*.

We regard this case as having been properly submitted to the jury, under well considered and appropriate instructions from the court; and, finding no error in those instructions, or in the refusal to instruct the jury as requested by the defendants, or in the admission of the parol evidence offered by the plaintiff to show the original verbal agreement in regard to the division and holding of the pews among the subscribers as claimed by him, the judgment of the county court is affirmed.